# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 1:20-cr-00259-MHC |
| v. | |
| **BENY MESIKA**, *et al.*, | |
| Defendant. | |

## SENTENCING MEMORANDUM

Bruce S. Harvey
Stephen M. Katz
**LAW OFFICES OF BRUCE S. HARVEY**
146 Nassau Street
Atlanta, Georgia 30303-2010
Telephone: 404.659.4628

## INTRODUCTION

In June 2016, the Government charged Mesika and his then business partner, John Wesley Houser IV in a 12 count indictment. In December 2017, the Government filed a 25-count superseding indictment, adding which, among other things, added Mesika's wife, Elizabeth Keucher. And, in August 2019, the Government filed a Second Superseding Indictment. Under any of the indictments, Mesika, then aged 50, faced a multi-year prison sentence, forfeiture of millions of dollars of property, and mandatory deportation to Israel. As of December 18, 2019, discussions of a plea had been terminated.

To say the case did not go exactly as planned for the Government is something of an understatement. Four years after the indictment and 25 days before the January 13, 2020 trial, the Government informed Mesika that it intended to unilaterally dismiss the most serious charges against him and allow co-defendants Houser and Keucher to withdraw guilty pleas to felony charges. On December 18, 2019, this Court held a conference call and granted the Government's motion to continue the trial.

Thereafter, the Government agreed that the charges against Mesika should be limited to misdemeanors. A plea agreement for the misdemeanors was entered into on July 21, 2020. For the reasons expressed below, Mesika contends that a sentence of "time served" — reflects the circumstances and fully satisfies the relevant sentencing

objectives.

## DISCUSSION

### A. The Legal Standard

Sentencing in federal court is a four-step process. Courts in this district

> (1) calculate the sentencing range recommended by the advisory Guidelines;
>
> (2) determine whether a sentence within that range, and within statutory limits, serves the factors set forth in 18 U.S.C.§ 3553(a), and, if it does not, select a sentence that does serve those factors;
>
> (3) apply applicable mandatory statutory limitations, if any; and
>
> (4) articulate the reasons for selecting the particular sentence and, if applicable, explain why a sentence outside the advisory Guidelines range better serves the relevant sentencing purposes set forth in 18 U.S.C. § 3553(a).

### B. Mislabeling of Supplements

The charges against Mesika in the Information are for misdemeanor mislabeling. The relevant statute contains provisions for both misdemeanor and felony labeling. The difference between the provisions is that misdemeanor provision imposes strict liability for mislabeling while the felony mislabeling provision involves "intent to defraud or mislead":

> (a) Violation of section 331 of this title; second violation; intent to defraud or mislead

Page 4 of 22

(1) Any person who violates a provision of section 331 of this title shall be imprisoned for not more than one year or fined not more than $1,000, or both.

(2) Notwithstanding the provisions of paragraph (1) of this section, if any person commits such a violation after a conviction of him under this section has become final, or commits such a violation with the *intent to defraud or mislead*, such person shall be imprisoned for not more than three years or fined not more than $10,000, or both.

21 U.S.C. § 333(a).

On March 20, 2020, Mesika made it clear to the Government that he would not enter a plea to 21 U.S.C. 333(a)(2) because he could not truthfully state to this Court that he violated this statute with an "intent to defraud or mislead." (Exhibit 1).  Mesika made clear he would only enter a plea as to a violation of 21 U.S.C. 333(a)(1) because a violation under that provision did not involve an intent to defraud or mislead.

In fact, there was no intent, at least not by Mesika, to defraud or mislead. The evidence is undisputed that Houser was solely or at least primarily responsible for product formulation and labeling at the parties' business:

Sent: Thursday, August 23, 2012 9:04 PM
To: foundationsupplements@gmail.com; rogernitto@gmail.com
Subject: RE: Final Day for July's Specials... Don't Miss out...

Roger,

**I am the one who handles all of the formulation and private labeling for our company**. Jeremy told me to get in touch with you

in regard to your energy drink. If you can give me a little more information on how many units you're looking to start with, price point you need to be at, what type of user experience you'd like to mimic then we can get started. Whenever you have time you can call or email me. I work every day. Thanks buddy.

Wesley Houser
Direct: 404.975.8099

(Exhibit 2)(emphasis added).

Mr. Houser's statement that he handled "all of the formulation and private labeling" for the enterprise is supported by numerous witnesses, including the Government's witnesses. Employees interviewed by FDA agents confirmed that Houser handled the formulation of the supplements:

- Jeb Pruett ("'Wes' [Houser] was a sales manager and person in charge of formulations.";

- Todd Wotiz ("Wotiz stated Houser was the person who came up with the formulations for the prohormone products.");

- Jerrold Shaw ("Houser ordered raw materials.");

- Jonathan Cohen("Cohen stated he began working for DuraCap Labs in or about January 2016. Cohen stated he worked in private label sales, in the sample laboratory and also ordered raw materials for DuraCap Labs at Houser's direction.")

- Dustin Depanicis ("Depanicis stated Houser remained involved in ordering and receiving raw materials for products not manufactured by Dura Cap Labs.");

- Andrew Ward ("Ward stated Houser emailed work orders

to Wolff and cc'd Ward. Ward stated the emails would detail the bottle specs, count, formula and customer information.").

The quoted statements above are verbatim quotes from FDA agent's interview notes taken in 2016, 2017 or later. All of the aforementioned individuals were interviewed by the Government and were expected to testify for the Government had the case gone to trial. Attached are the declarations of other employees of the business who state under oath that Mesika had no involvement in formulating supplements or labeling products. (Affidavit of Lillian Casiano, ¶¶ 7, 8);; (Affidavit of Nancy Lam, ¶¶ 5, 6);(Affidavit of Brett Swider, ¶¶ 7, 8).

Likewise, Houser was solely or primarily responsible for the formulation of the supplements and purchase of raw ingredients. In 2016, Xinli Li, the Chinese supplier of raw materials was indicted and pled guilty to conspiracy in a one count information. Li was originally indicted on 54 counts.[1] Mr. Li was sentenced to "time served" and two years of supervised release.  As part of his plea agreement, Mr. Li was required to provide truthful information about the importation of unlawful supplements.

On March 9, 2016 —four months before Mesika was indicted—

---

[1] *United States v. Li*, U.S.D.C. W.D.Va., CaseNo.1:15-CR-00031. The original charges against Li included Importation of Controlled Substances (21 U.S.C. § 952(b)), Smuggling Goods into the U.S. (18 U.S.C. § 545), Wire Fraud (18 U.S.C. § 1343), Conspiracy to Commit Wire Fraud (18 U.S.C. § 1349), and Illegal Distribution of Controlled Substances (21 U.S.C. § 841).

FDA Special Agent Timothy Royster and FDA Supervisor Jennifer Vorsteg debriefed Li. Royster and Vorsteg informed law enforcement and then AUSA Grimberg of the following facts statements from Houser's Chinese supplier:

> *He had never heard of or met Beny Mesika*. He was not sure if Shawna Wen met with Will Keller when she was in Georgia but there were several different companies involved and she was seeking their business. They saw many of these folks at the trade shows and usually got calling cards from them and called them later about their products. *He recalled Wes Houser and that he had others with him but he did not recall their names*.

> He did not recall the names Adrenaline Nutrition Supplements or Twin Peaks Formulations. *He did not know Elizabeth Kuecher*.

> *Wes Houser ordered some of the same steroids and pro-hormones as Keller ordered and he shipped some of these to Houser in the bottom of drums of nutritional products*. However, he thought most of the shipments to Houser's companies were by FedEx.

(Exhibit 3).

The fact that Houser was solely or primarily responsible for formulation and labeling does not excuse Mesika from criminal liability under 21 U.S.C. § 333(a)(1), which holds operators "strictly liable" for mislabeling and imposes misdemeanor penalties. When a label fails to contain an ingredient, the operator is criminally liable under 21 U.S.C. § 333(a)(1) regardless of his intent or state of mind. Mesika accepts

responsibility for the mislabeling of dietary supplements.[2]

### C. Mesika Has Demonstrated Acceptance of Responsibility by Words and, More Importantly, by Deeds

The requirements for acceptance of responsibility are detailed in USSG §3E1.1(a): "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." Note 1 to §3E1.1 provides:

> Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility, but the fact that a defendant's challenge is unsuccessful does not necessarily establish that it was either a false denial or frivolous…

(USSG §3E1.1, Note 1).

In Mesika's view, "acceptance of responsibility" means or should mean something more than being the first defendant to enter a plea and a formulaic statement of regret. A genuine acceptance of responsibility requires introspection, ensuring that the statements about conduct are accurate, and demonstrable evidence that the accused has severed

---

[2] The unidentified ingredient was Dimethazine, which was not unlawful at the time the label was affixed and the product distributed. Dimethazine should have been identified on the label. It wasn't.

criminal associations and taken action to ensure that similar conduct is never repeated. Mesika has more than met the legal standard for "acceptance of responsibility."

Mesika did not approach the plea discussions during the previous four years lightly. Mesika refused to enter into plea agreement that did not accurately reflect his criminal conduct. Before entering into the plea agreement, Mesika made it plain to the Government that his acceptance of responsibility was limited to the misdemeanor counts in the Information because he could fully accept responsibility for the charges in the Information. Mesika reiterated to the U.S. Probation Officer preparing the PSR that he fully accepted responsibility for his conduct relating to the misdemeanor offenses. More importantly, Mesika has carefully examined his conduct to ensure that his acceptance of responsibility is genuine.

Note 1 to USSG §3E1.1 describes eight non-exclusive factors for determining whether a defendant qualifies for acceptance of responsibility. Each of those factors is applied below:

1. **truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct).**

An analysis of the "relevant conduct" in this case is complicated for two reasons.

First, just before the scheduled trial on January 13, 2020, the Government unilaterally informed Mesika that it was dismissing the most serious charges. The Government stated that, at a minimum, it was dismissing Counts I-IV of the Second Superseding Indictment, which included conspiracy to "manufacture, distribute, and dispense, and possess with the intent to manufacture, distribute, and dispense, anabolic steroids" (21 U.S.C § 846) that resulted in "serious bodily injury and death for at least one such consumer," and Distribution of a Controlled Substance in violation of 21 U.S.C. § 841. Given the Government's unilateral representation it intended to dismiss these charges and allow co-defendants to withdraw guilty pleas, the charges in Counts I-IV of the Second Superseding Indictment should not be considered "relevant conduct."

The second reason an analysis of "relevant conduct" is problematic is that Mesika's co-defendant was simultaneously involved in a larger conspiracy in which Mesika had no involvement. In April 2014, Houser formed a business with several individuals who are currently defendants in a large, similar criminal case in the Southern District of Florida that was investigated for several years and brought in 2019. *See United States v. Singerman, et al.,* U.S. District Court – S.D.Ga., Case No. 9:19-cr-80030-WPD.

The Florida Indictment alleges that Houser is an unindicted co-conspirator. Specifically, the Florida Indictment alleges:

Unindicted Co-conspirator 1 [HOUSER] was an owner and manager of Fight Pharm, LLC, a supplement manufacturing company in Palm Beach County, Florida, and an owner and manager of a business in the State of Georgia that manufactured products for BLACKSTONE.

Aaron Singerman, Phillip Braun, and Unindicted Co-conspirator 1 [HOUSER] established Fight Pharm, LLC (Fight Pharm) as a limited liability company under the laws of the State of Florida on or about April 16, 2014. Fight Pharm manufactured and sold drugs purportedly marketed as dietary supplements to customers throughout the United States.

Anthony Ventrella, Unindicted Co-conspirator 1 [HOUSER] and Unindicted Coconspirator 2 ordered illegal and unsafe ingredients from China imported into the United States with false and fraudulent documentation, hiding the true contents from FDA and other departments and agencies of the United States Government.

(Exhibit 4, pgs. 4, 5). Houser has cooperated and is expected to testify against his Florida co-conspirators when that case goes to trial in June 2021.

Unlike Houser, Mesika did not participate and has never been implicated in the Florida conspiracy. Aaron Singerman —one of the lead defendants in the Florida case— gave the Government a proffer March 2, 2017 and Houser has continually cooperated with the Government in the Florida case since at least January 2017. Had Mesika been involved in that conspiracy, Houser's cooperation agreement with the Government in that case would have required him to provide

truthful statements about any involvement by Mesika in the Florida conspiracy that Houser joined and was an active participant.[3]

In light of the Government's eve-of-trial representation that it intended to withdraw the most serious charges against Mesika and the difficulty of separating Houser's acts in similar conspiracy in Florida in which Mesika was not involved, the "relevant conduct" in this case should be limited to the misdemeanor mislabeling charges to which Mesika has pled.

## 2.  voluntary termination or withdrawal from criminal conduct or associations;

Mesika voluntarily exited the supplements business in early January 2017, less than a year after he was indicted. By contrast, J. Wesley Houser IV, the co-defendant (a) lied about his intention to leave the supplements business, (b) expanded his supplements business and entered into a partnership with Jared Wheat, a convicted felon who is currently under indictment in this court, and (c) continues to commit violations of FDA regulations.

It is clear that Houser lied about his intention to leave the supplements business. A Memorandum of Interview (MOI) written by

---

[3] Surprisingly, in this case the Government provided no Brady material from Houser's Florida conspiracy case even though Houser was a co-conspirator and Mesika was not involved. There is evidence that Houser, acting behind Mesika's back, used resources from Atlanta to further the Florida conspiracy. The Government did provide Brady information from the Virginia case involving the Chinese supplier who dealt with Houser and did not know Mesika.

FDA Special Agents confirms that Houser told the agents that he never intended to leave the supplements business and deliberately lied to Mesika about his intentions:

> Houser stated his buyout agreement is different. Houser stated he made it look like he was leaving, but he actually stayed. Houser stated his agreement says he will stay on for six (6) months but he has no intentions of leaving.

(Exhibit 5).

Houser simply replaced Mesika with Jared Wheat, a convicted felon and notorious manufacturer of illegal supplements who is currently under indictment in this court. *See United States v. Wheat*, U.S.D.C. N.D.Ga., Case No. 1:17-cr-0229-AT.   Houser and Wheat remained partners in the supplements business until a few days ago. On October 14, 2020, Wheat sold his interest in the business to a third party. To this day, Houser remains in the supplements business and has continued to violate FDA regulations. As recently as May 21, 2020, the FDA cited Houser for violation of FDA regulations:

> Reference: CMS #604298

> Dear Mr. Houser:

> The United States Food and Drug Administration (FDA) conducted an inspection of your manufacturing facility located at 6080 McDonough Drive, Suite A, Norcross, GA from November 5 - December 11, 2019.

> During the inspection, our investigators also collected and reviewed labeling for your products. Based on the inspectional findings and subsequent review of your product labels, we have identified serious violations of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations.

(Exhibit 6).

**3. voluntary payment of restitution prior to adjudication of guilt;**

Mesika entered into an agreement to pay restitution in 2017, though he disputed that his unlawful conduct caused injury. The restitution was paid in full before Mesika was adjudicated guilty by this Court.

**4. voluntary surrender to authorities promptly after commission of the offense**;

Mesika voluntarily surrendered to authorities shortly after his arrest in 2016.

**5. voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense;**

Mesika voluntarily assisted the FDA. In addition to committing "serious violations" of FDA regulations 4 years after the indictment, Mr. Houser, along with Mr. Wheat, manufactured supplements with illegal substances in 2017, after Mesika exited the business. Houser and Wheat stored supplements containing illegal substances in a warehouse formerly owned by Mesika and Houser (The warehouse continues to be the subject ongoing litigation between Mesika and Houser).

Upon discovery of the substances in the warehouse, Mesika objected and demanded that Houser remove and destroy the substances. Houser refused. Mesika thereafter called the FDA agent, met with the FDA agent at the warehouse, pointed out the boxes of substances that Houser had stored and refused to destroy, asked the FDA for direction, and thereafter destroyed the substances at his own expense even though he had no part in manufacturing or storing the substances.

**6. voluntary resignation from the office or position held during the commission of the offense;**

Not applicable. See also Response to factor 2, above regarding Mesika's voluntary exit from the supplements business.

**7. post-offense rehabilitative efforts (e.g., counseling or drug treatment); and**

Mesika's post-rehabilitative efforts have been extensive and include the following. Mesika

- exited the supplements business within a few months after the indictment;

- complied in full with all conditions of his pre-trial release throughout the last four years;

- notified the FDA when he discovered that Houser and Wheat were storing unlawful substances in a warehouse that had formerly been owned by Duracap Labs (the unlawful substances were manufactured by Houser and Wheat in 2017, after Mesika had exited the supplements business);

- paid the $75,000 forfeiture in full within days after entering his plea and well before final sentencing;

- paid restitution in full prior to entry of his plea even though the claim for restitution was disputed;

- implemented an extensive compliance program in his current business to ensure that government regulations are strictly followed; and

- has given extensive contributions of time and funds to the community, deserving individuals, and society before and after Mesika was indicted as evidenced by the 29 declarations that have been contemporaneously filed with the court.

**8. the timeliness of the defendant's conduct in manifesting the acceptance of responsibility**.

Mesika timely manifested acceptance of responsibility. During the four year period after the initial indictment, Mesika engaged in plea discussions with the Government. Within a few months after the Government informed him and the Court that it intended to withdraw the most serious charges, Mesika entered into a plea agreement in which he accepted responsibility for the offenses contained in the Information. In addition, Mesika's post-offense rehabilitative efforts were timely commenced after the initial indictment and remained constant through and including today.

**D. The Rationale for Supervised Release is Not Present in this Case**

The primary purpose of supervised release is to facilitate the

reintegration of federal prisoners back into the community rather than punish them. *See Federal Offenders Sentenced to Supervised Release, pg.* 2, n.11 (U.S. Sentencing Comm. July, 2010); *see e.g. United States v. Nestor*, 678 Fed. Appx. 73, 76 (3d Cir. 2017)("[W]e review the reasonableness of a supervised release term against the § 3553(a) factors, recognizing that the primary purpose of supervised release is to facilitate the integration of offenders back into the community rather than to punish them.")(cite omitted).

For the following reasons, no purpose would be served by imposition of a term of supervised release. Mesika

- successfully completed more than four years of pretrial release without a single violation;

- voluntarily exited the supplements business and cooperated with the FDA with regard to removing unlawful substances that were manufactured by his former business partner;

- paid all sums due and owing, including the $75,000 forfeiture within days of entering his plea;

- shares custody of his four year old son and has been a responsible, good parent (*See* Declarations of Danielle Avivi, Deborah Tache);

- regularly contributes an extensive amount of his time to the community and those less fortunate;

- maintains strong ties to his synagogue and supports the efforts of the Rabbi in the community (Declaration of Rabbi Mark Hillel Kunis);

- operates a business that helps addicts recover and provides residential service to people with mental illness, employs 120 people, provides free services to the community at a cost of approximately $100,000 per month (Declaration of Brett Swider); and

- has for many years regularly donated money to help the less fortunate become self-sufficient.

There is no need to expend scarce resources to "integrate Mesika back into the community." Despite all that has transpired over the last four years, Mesika is a productive person who is integrated into the community. Because Mesika is integrated in the community, the only purpose for imposing supervised release would be punishment. The statute prohibits using supervised release as punishment.


DATE:  23 October 2020.        By:  **/s Bruce S. Harvey**
                                   Bruce S. Harvey
                                   Ga. Bar No. 335175
**LAW OFFICES OF BRUCE S. HARVEY**
146 Nassau Street
Atlanta, Georgia 30303-2010
Telephone: 404.659.4628
Email: bruce@bharveylawfirm.com

By: **s/ Stephen M. Katz**
Stephen M. Katz
Ga. Bar No. 409065

Of counsel to
Law Offices of Bruce S. Harvey

**THE KATZ LAW GROUP** LLC
1225 Johnson Ferry Road
Building 100 – Suite 125
Marietta, Georgia 30068-5407
Telephone: 770.988.8181
Email: smkatz@smk-law.com

### CERTIFICATE OF SERVICE

I have this date served upon all counsel of record

### SENTENCING MEMORANDUM

by transmitting it as follows:

| ☐ | Hand Delivery; |
|---|---|
| ☐ | Facsimile transmission; |
| ☐ | Email_____: |
| ☐ | Overnight Delivery Service; |
| ☐ | First Class Mail, postage pre-paid; |
| ☒ | Electronic Filing |

upon all counsel of record and/or other individuals listed below:

Kelly K. Connors, Esq.
Assistant United States Attorney
Northern District of Georgia
Richard B. Russell Federal Building
Suite 600
75 Ted Turner Dr. SW
Atlanta, Georgia 30303-3309

Date:  23 October 2020.                    By: s/ Stephen M. Katz
                                               Stephen M. Katz
                                               Ga. Bar No. 409065

**THE KATZ LAW FIRM – Ga.** LLC
1225 Johnson-Ferry Road
Building 100 – Suite 125
Marietta, Georgia 30068-5407
Telephone: 770.988.8181
Email: smkatz@katz.legal